IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Anthony Mann (242498), | ) | C/A No. 0:15-cv-163-RMG-PJG |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Reply to the Attorney General's |
| | ) | Return and Memorandum of Law |
| Warden of Lee Correctional, | ) | in Support of Motion for |
| Cecelia Reynolds, | ) | Summary Judgement |
| Respondent. | ) | |
| _____ | ) | |

**To: Magistrate Judge Paige J. Gossett**

**A.    Introduction**

Anthony Mann was convicted of two counts of murder on the basis of self-serving and highly unreliable witness testimony.  In this case-- based entirely on circumstantial evidence-- petitioner's trial counsels' performance was wholly substandard and repeatedly counsel failed to protect petitioner's federal Constitutional rights.  First, trial counsel failed to preserve petitioner's right to an open and public trial by allowing the trial court judge to close four hearings.  Then, trial counsel failed to object to the introduction of a shotgun that had absolutely no connection to these killings.  Trial counsel also failed to object to the introduction of highly improper, prejudicial, and irrelevant character evidence relating to petitioner's confinement at Lieber Correctional Institution during his pre-detention confinement, and then again when petitioner's ex-girlfriend sought to attack him while she was on the stand.  Also, trial counsel failed to introduce the expert testimony of Dr. Janice Ross, a well-known pathologist available at the time of trial, who was prepared to opine that the State's use of vitreous fluid to establish victim

1

B.B.'s time of death was unreliable.  According to Dr. Ross, almost any pathologist would have rendered that opinion, had counsel thought to call one at trial.  Dr. Ross testified at petitioner's state post-conviction relief hearing, but the state court judge failed to even address the claim.  Trial counsel also failed to protect petitioner when the Solicitor improperly buttressed her witnesses and remarked on petitioner's post-arrest silence during her closing argument.  Individually, and collectively, these instances of ineffective assistance of counsel denied petitioner his right to a fair trial.

In challenging his convictions, Mann was entitled to show the appellate courts that law enforcement coerced these State's witnesses into adopting the State's version of events at the expense of the truth.  He was unable to do so, however, because appellate counsel failed to secure critical hearings that occurred off the record, during his trial, and now those transcripts have been destroyed. Fundamentally, Mann has been unable to challenge his convictions due to the ineffectiveness of his appellate counsel.

The PCR judge's order of dismissal is contrary to, or involves an unreasonable application of clearly established federal law as determined by the United States Supreme Court regarding ineffective assistance of counsel as propounded in *Strickland v. Washington*, 466 U.S. 668 (1984).  Its decision is also based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  §2254(d) (1), (2).  Petitioner was substantially and injuriously prejudiced by his attorneys' substandard performance.

*Brecht v. Abrahamson*, 507 U.S. 619 (1993). Petitioner respectfully asks this Court to grant his petition for writ of habeas corpus, and release him from custody.

## B.    Relevant Facts

Petitioner was tried, in a single trial, for the killings of both D.T. and B.B. D.T. was killed on January 7, 2002 as established by multiple witnesses. B.B.'s body, however, was found on January 13, 2002 in a location far from where D.T. was fatally shot. The State's theory of the case was that petitioner killed B.B. because she witnessed petitioner shooting and killing D.T. The State stipulated that there was no forensic evidence connecting petitioner to B.B.'s death. DE No. 27-3, p. 48.

D.T. was the "owner" of a business called "Sillouettes," an organization that functioned as an escort service. B.B. was one of D.T.'s hookers. Young, homeless, and an exotic dancer living far from her New York family, she was living with D.T. when D.T. was killed. DE No. 27-1, p. 177. Earlier that night, B.B. called petitioner to ask him to help her escape from D.T. She was tired of being prostituted. According to state witnesses, B.B. informed petitioner that there were drugs and money in a safe in the house. The State's theory was that the drugs and money constituted the motive for the theft. However, when police searched the house, they found $500 remaining in the safe.

Petitioner and state witnesses, Michael Crumb and Eric Zack, stopped by Peter Davies house to retrieve a gun. They then went to D.T.'s house. After a confrontation, D.T. was shot. At the time he was shot, Crumb and Zack were sitting

outside in the car.  Petitioner and B.B. were in the house.  They exited the house and drove away.

The State called multiple witnesses to testify to these events.  Donna Kann was a Charleston County EMS who lived across the street from D.T.  She heard the gunshot.  It was dark and there were no lights in the area.   At the time of her initial statement to the police, she described the shooter as wearing a knit cap.  In fact, she referenced the knit cap twice in her statement.  Docket No. 27-1, p. 210-211.  She testified that the person she saw "could have been" a woman.  DE No. 212-213.  She also testified that due to the person's "mannerisms" she thought it was a white person.  DE No. 27-1, 217.

Buddy Bedsaul was a law enforcement officer.   He testified that Kann's initial description was of a white male, approximately 5'10", 180 pounds, and between the ages of 28-31.  DE No. 27-1, 221.

The State then called the first of its highly problematic witnesses to the stand, Michael Crumb.  At the time of his testimony, he had already pleaded guilty to voluntary manslaughter and armed robbery but was awaiting sentencing.  DE No. 27-1, p. 268.  He admitted that he initially lied to police.  DE No.27-1, p. 311.  He also stole a car and fled to Florida as the police were investigating the case.  DE No., 27-1, pp. 314, 317.  His mother was arrested for trying to cover up for him.  DE No. 27-1, p. 319.  Crumb testified that the last time he saw B.B. she was wearing jeans, a sweatshirt, and a bandana.  DE No. 27-1, p. 324.  Crumb admitted that he

told Maria Jacques that he would "tell the police whatever [he] had to try and get out of this."  DE No. 27-1, p. 329.

Crumb signed a proffer agreement with the State with the assistance of his attorney.  Before he signed the proffer, though, he watched a video of another co-defendant, Eric Zack, give his statement to the police.  DE No. 27-1,p. 373.  As part of his sweetheart deal, he was allowed to plead guilty to lesser offenses, and he was also allowed to plead before a "lenient judge."  DE No. 27-1, p. 345.  He was also allowed to see his son.  DE No. 27-1, p. 349. At the time he gave his statement, he did not disclose his efforts to break into a safe that contained money and drugs in D.T.'s house.  DE No. 27-1, p. 363.  Once he signed his proffer agreement, Crumb, for the first time, told law enforcement that petitioner wore gloves that night.  He told them that B.B. was looking for a bandana; that petitioner tried to open the safe; and that petitioner said he was going to "get rid" of B.B.  DE No. 27-1, p. 369. Crumb admitted that he tried to minimize his involvement with these crimes when he spoke to law enforcement.  DE No. 27-1, p. 370.

Eric Zack was another of the State's key witnesses with substantial problems telling the truth.  He met with members of the Solicitors Office **four times** before trial, including the occasion when he made his videotape.  DE No. 27-1, pp. 422-23. He initially lied about who went over to D.T.'s house that day.  As he admitted, he was trying to protect Michael Crumb.  DE No. 27-1, p. 391.  He testified that when petitioner spoke of getting "rid" of B.B., he understood that to mean that he was going to hide her so she could go back to New York.  According to him, petitioner

had spoken that day about her going back to New York.  DE No. 27-1, pp. 411-412; 432-433.  Zack also testified that B.B. said that D.T. "got what he deserved."  DE No. 27-1, p. 435.

Zack testified that he believed initially that law enforcement was interested in Peter Davies' participation in this case.  At the time, Davies was also a suspect in a homicide investigation in Berkeley County.  According to Zack, law enforcement informed him of petitioner's version of events, and wanted his story to "match" petitioner's.  DE No. 27-1, pp. 435-436.  He "just said what they wanted [him] to say to let [him] go home."  DE No. 27-1, p. 437. As he was being interviewed by law enforcement, he was crying and upset.  DE No. 27-1, p. 438. Zack admitted his version of events changed, and that he was trying to help himself out.  DE No. 27-1, pp. 440-41.  Upon information and belief, both Crumb and Zack received 10 year sentences for their participation in these events, and both have been released from the South Carolina Department of Corrections.

Terrence Hudson testified for the State. He was good friends with Peter Davies.  DE No. 27-1, pp. 471-72.  On January 7, 2002, Peter Davies called him asking for a favor.  DE No. 27-1, p.473.  When Hudson arrived at an apartment in West Ashley, Davies told him that he, petitioner, and B.B. needed a ride.  DE No. 27-1, p. 475.  They loaded two trash bags into the trunk of his car.  Hudson testified that he thought he saw a gun in petitioner's pocket.  DE No. 27-1, p. 476.  Hudson was asked to take the three of them to a car at Player's Place off Ashley Phosphate Road, in Charleston, SC.  DE No. 27-1, p. 477. He took them there and then left.

DE No. 27-1, p. 478.  On his way home, Hudson testified he saw that same car at a friend's house, so he stopped in.  He testified he was there for about 5 minutes and saw that Peter Davies was in the shower.  B.B. and petitioner were also there.  DE No. 27-1, p. 478.   Hudson testified that he and Peter Davies are no longer friends because Davies stole from him.  DE No. 27-1, p. 489.

Michael Ringley of the Charleston County Sheriff's Office also testified for the State.  He stated that D.T.'s body was found on the porch area of the house.  DE No. 27-2, p. 16.  Inside the safe in the house, there was a box containing $500.  DE No. 27-2, p. 34. He did not retrieve any defendants' prints inside the house.  DE No. 27-2, p. 52.

Nichole O'Connell testified.   Petitioner and B.B. came to her house the night of January 7, 2002.  She recalled that Petitioner asked B.B. if she had any regrets and that she got quiet.  DE No. 27-2, p. 57.  She said 'no' she did not.  DE No. 27-2, p. 85. Peter Davies took a shower at her house, which was unusual.  DE No. 27-2, pp. 55-56; 66.  B.B. was wearing blue pants, a hoodie, and a bandana.  DE No. 27-2, p. 58.  She testified that she thought B.B. was acting "odd" when she was at her house.  DE No. 27-2, p. 67.  O'Connell testified that she met with investigators from the Solicitor's office **five times**.  She met with the solicitors on that many occasions, too.  DE No. 27-2, pp. 77-78.

Tiffany Mercado, or "Star," testified that B.B. was a good friend of hers.  DE No. 27-2, p. 89.  B.B. did not have anywhere to live until she moved in with D.T. DE No. 27-2, p. 90.  Earlier on January 7, 2002, she spoke to B.B. who told her she

needed to get out of D.T.'s house.  DE No. 27-2, p. 92.  Star did not have a car, so she could not come and pick her up. DE No. 27-2, p. 93.  B.B. wanted to get out of D.T.'s house because D.T. and his roommate wanted her to have sex with them and she did not want to.  DE No. 27-2, pp. 100-101.

The key evidence against petitioner was the testimony of Kristy Bunch, his then-girlfriend who was clearly still angry with him over the breakup.  According to her, petitioner wrote her a letter and asked her to say that Peter Davies told her (Bunch) that "Brownie was still missing and they won't find the little bitch."  DE No. 27-2, p. 201.  Bunch also testified to a letter sent by petitioner that asked her to testify that he was with her from Monday night, January 2, 2002 to Thursday night, January 10, 2002.  DE No. 27-2, p. 202.  In fact, Bunch had given a statement to law enforcement that stated she was with petitioner from 10:00pm on January 7th until the date they were arrested.  She claimed that was a mistake, and that she confused her dates.  DE No. 27-2, pp. 208-09.  She uses drugs on a daily basis.  DE No. 27-2, p. 217.  If she did not cooperate with law enforcement, they threatened to take her children from her.  DE No. 27-2, p. 222.  She was questioned by "three or four or five different officers."  DE No. 27-2, p. 222. She spent approximately 6 hours talking to law enforcement on the night she was arrested.  Bunch testified that petitioner "confessed" to her during an argument they had over the telephone. Petitioner was incarcerated at Lieber Correctional, and despite law enforcement's attempts to recover a recording of this "confession," they never found one.  DE No. 27-2, p. 204; 27-3, p. 80-85.

The State also called Shannon Keyes. DE No. 27-2, p. 359. She testified that she had a conversation with him, and that he said that he and Brownie had to "do something" but that it "didn't turn out the way it was supposed to" and that "he had to do what he had to do and he had to lay low for awhile." DE No. 27-2, p. 362. She was interviewed by two officers, who handcuffed her towards the end of her interrogation. She testified it seemed like 8 hours. DE No. 27-2, p. 371. They showed her pictures of B.B.'s dead body. She had just turned 16 years old. It gave her nightmares. DE No. 27-2, p. 373.

Dustin Ryan James testified. DE No. 27-2, p. 379. He recalled seeing petitioner at the Old Dorchester Club on Friday, January 11th. DE No. 27-2, p. 379. He testified that he asked petitioner if he had seen B.B. and that petitioner motioned with his hands across his throat, pointed to his chest, and held a finger up to his mouth. DE No. 27-2, p. 380. James did not ask him any questions. At some point, he said petitioner told him that he "dealt with her and put her in the woods." DE No. 27-2, p. 381. Shortly after this encounter with petitioner in the bathroom, James testified there was a fight at ODC and that petitioner said, "I'm wanted for two murders now, I will kill you too." DE No. 27-2, p. 382. Dustin had just been released from federal prison. DE No. 27-2, p. 401. He also had convictions for assault with intent to kill, larceny, receiving stolen goods, contempt, and giving false information to the police. DE No. 27-2, pp. 402-03. When he was giving his statement to law enforcement, he had been picked up on a burglary warrant. Even though Burglary 1st degree carries a possible sentence of 15 years to life, he was

allowed to plead to a reduced charge and received 18 months.  He testified he "paid a lot of money for a lawyer."  DE No. 27-2, p. 404-05.

Maria Ann Jacques testified.  DE No. 27-2, p. 409.  She was at the Old Dorchester Club on January 11th and testified that petitioner said "he had a murder charge and he was not scared to get another one."  DE No. 27-2, p. 413.  The first time she spoke to law enforcement, and when she gave her 7 page statement, she did not say anything about this comment petitioner allegedly made.  DE No. 27-2, p. 417.

During the defense's case, petitioner called Mark Akmen, the person with whom petitioner was fighting.  DE No. 73-p. 277.  Akmen testified that petitioner never said "he's got two murder charges and isn't afraid to get another" or "I'm wanted for two murders, I'll kill you too."  DE No. 27-3, p. 283.  The defense also called Chuck Jones, who was also there when the fight occurred.  DE No. 27-3, p. 293.  He never heard anyone speak of "murders" either.  He broke up the fight between petitioner and Akmen.  DE No. 27-3, p. 298.

The State called Krystal Lackey.  DE No. 27-3, p. 56.  She testified she saw petitioner "once" at a gas station, and then once when he came to her house.  DE No. 27-3, p. 57.  He was there to pick up a friend, Travis.  Then, just out of the blue, petitioner apparently told her he killed two people!  DE No. 27-3, p. 58.  Although there were, according to Lackey, a number of other people there, the State did not call anyone else to testify they overheard this.  DE No. 27-3, p. 59.  Lackey was arrested in connection with a burglary, along with the other people she says were at

her house that night.  DE No. 27-3, p. 64.  She was allowed to go through Pre-trial

Intervention.  DE No. 27-3, p. 65.  The following exchange then took place:

> Q:    Did you go through PTI?
>
> A:    I'm going through it now.
>
> Q:    You are?
>
> A:    Uh-huh.
>
> Q:    And the solicitor had to agree for you to go through PTI?
>
> A:    No.
>
> Q:    Nobody had to agree for you to go through it?
>
> A:    No.

DE No. 27-3, p. 65.

The significance of this exchange is that it has long been the case in South

Carolina that PTI is run through the Solicitors' Offices, and it has always been the

case that the solicitor has to agree to a defendant's participation in the program.

No one corrected Lackey's obviously false testimony on this point.

The State offered the testimony of "Mervin Menier," a serial state's witness

with extraordinary credibility problems.   Menier testified to the perfunctory "jail

house confession."  On cross-examination, Menier admitted he has used a number of

aliases, including Damon Stone, Robert Quincy Rodriguez, Gary O'Neil Pamphile,

Mark Taylor and/or Stone.  DE No. 27-3, p. 111.  He admitted he "basically" used

names so he could commit crimes and it would be difficult to catch him.  *Id*.  They

11

had to have a two day federal court hearing to determine his identity in another case.  DE No. 27-3, p. 114.

In addition to Akmen and Jones-- the two witnesses present at the fight at the Old Dorchester Club but who did **not** hear petitioner yell anything about any murders-- the defense called William Woodson.  Woodson knew Michael Crumb from prison.  Woodson testified that Crumb told him that B.B. shot D.T, and that Michael Crumb said that he would do anything to get out of these charges.   DE No. 27-3, p. 306—362.

Petitioner did not testify at trial.  The jury began deliberations at 3:10pm.  After receiving an *Allen*[1] charge, they rendered their verdict at 11:16pm.

### C.    Habeas Claims and Argument

### I. Petitioner was denied his Sixth Amendment right to effective assistance of counsel and his right to a public trial through trial counsel's failure to assert and protect this right when various secret hearings were held in Mann's trial.[2]

Petitioner raised this claim in the state court proceeding, and the PCR judge held:

> This Court finds that Applicant was not denied the right to a public trial.  The in-camera hearings were on the record in the sealed transcripts.

DE No. 27-4, p. 426.

There were four hearings that occurred during this trial outside the presence of the public and, at times, outside the presence of petitioner or his attorneys.

---

[1]    *Allen v. United States*, 164 U.S. 492 (1896).

[2]    The Attorney General's Office concedes this issue is exhausted.

First, the Public Defender's Office subpoenaed a Berkeley County investigative file relating to their investigation of Peter Davies in an on-going homicide investigation. The Berkeley County Sheriff's Office moved to quash the subpoena. DE No. 27-1, p. 137. The trial court judge then called the parties into chambers to hear "how it could implicate [petitioner's] case."

The court said:

> [F]irst I want to hear what her legal defense, hear any arguments she has that could implicate the defense of the defendant, then I will make a decision on whether it should be in a closed proceeding or not, and then depending on that decision, I will hear the Berkeley County office and their motion back in here.
>
> All right. I'm only going in chambers to only hear how it could implicate your case, then we'll come back in here and argue the law.
>
> Madam Court Reporter, you need to set up in the conference room, please.

DE No. 27-1, pp. 143-44.

The issue was not further argued on the record.

Then, a second hearing also related to the subpoena issue was held outside the presence of the public, and this time trial counsel was not allowed to be present either. Trial counsel argued:

> MS. SHEALY: And, your Honor, again my position would be that I would be prejudiced and entitled to be present for the hearing.
>
> THE COURT: Well, I've already heard your reasons. Anything else is going to be arguments of the law. You were able to present to me *ex parte* how it affects the case. If we have to do that again, we'll do that . . . But I have to hear everybody else on this issue, too. If it turns, for example, as to whether this is a *Brady*[3] issue, they have a right to be heard on that. You seem to think that you get to argue the

---

[3]     *Brady v. Maryland*, 373 U.S. 83 (1963).

whole matter without anyone getting to say anything.  I disagree with
that.

DE No. 27-1, p. 253.

Trial counsel argued that the matter could possibly pertain to *Brady* material.  DE

No. 27-1, p. 256.   The public, trial counsel, and petitioner were all absent from this

hearing.

After the hearing, the court indicated that the hearing was "solely for the

purpose of hearing the County's request to quash the subpoena, which indicated

that I didn't think the State had a role in that particular aspect of it.

> In order to preserve the State's request that they have some
> concern about disclosure of information in another case insofar as law
> enforcement investigations, no information has been turned over.  The
> Court decided that it would look at the information itself and decide
> whether or not it could be used for any purpose other than the one
> articulated in court as a legal basis yesterday, that being bias.  So if it
> does turn into something that I think has to be disclosed, then I will
> get back with each side and let you know that."

DE No. 27-1, p. 260.

The public was excluded from both of these hearings relating to the subpoena

issue without any findings that its exclusion was necessary, or whether there were

other, less restrictive ways to conduct the proceeding.

Then, later in trial, defense counsel informed the court that there were

concerns that the Solicitor's office or their representatives were influencing the

testimony of witnesses in a manner adverse to petitioner's defense.  DE No. 27-3, p.

429.  A third hearing related to this issue was taken in a conference room.  DE No.

27-3, p. 430. Then, a fourth hearing was then also held. See Volume 8, gap between Tr. pp. 1479-1523.

Transcripts of these hearings do not exist because they were not requested by appellate counsel prior to the time court reporters are allowed to destroy their tapes. Four hearings, conducted outside the presence of the public (and at least one hearing conducted outside the presence of petitioner and his attorney), were held without objection from trial counsel, and without the trial court judge making a finding that the closures were necessary, or if there were less restrictive means by which to conduct the proceedings. Petitioner has couched this claim both in terms of the denial of his right to effective assistance of counsel, and as a right to a public trial.

(a) <u>Right to a Public Trial</u>

The trial court judge's actions violated petitioner's rights to a public trial by holding four hearings outside the presence of the public, petitioner, and even petitioner's attorney, without articulating reasons for the closure, or considering other, less restrictive alternatives. The law on this issue is clear—there is a presumption that a trial shall be open to all members of the public. The right to an open trial may give way in certain instances to other rights or interests such as a defendant's right to a fair trial, or the government's interest in inhibiting disclosure of sensitive information. The United States Supreme Court, in *Waller v. Georgia*, 467 U.S. 39 (1984) set out the standards courts must apply before excluding the public from any stage of a criminal trial:

[T]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.

The trial judge's obligations on this point are beyond dispute: "The conclusion that trial courts are required to consider alternatives to closure even when they are not offered by the parties is clear not only from this Court's precedents but also from the premise that "[t]he process of juror selection is itself a matter of importance, not simply to the adversaries but to the criminal justice system." *Presley v. Georgia*, 558 U.S. 209 (2013) (quoting *Press-Enterprise Co. v. Superior Court of Cal., Riverside Cty.*, 464 U.S. 501, 505 (1984) (*Press-Enterprise I*)).

The trial court judge simply failed to undertake what the United States Supreme Court demands.  The trial court judge had to identify the specific interests implicated, the threat to those interests, which must "be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered." *Presley* at 215-216 (quoting *Press-Enterprise I* at 510). And see *Press-Enterprise Co. v. Superior Court of Cal., County of Riverside,* 478 U.S. 1, 15 (1986) ("The First Amendment right to access cannot be overcome by the conclusory assertion that publicity might deprive the defendant of [the right to a fair trial"]).

The trial court judge's decision to remove these four hearings from the public courtroom (and even removing the defendant and trial counsel), without articulating an overriding interest that was likely to be violated, or considering

reasonable alternatives to closure, violated petitioner's right to a public trial under the Sixth Amendment. The state court adjudication of petitioner's claim—that petitioner was not denied his right to a public trial because "the in-camera hearings were on the record and in the sealed transcripts" resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States, and was also based on an unreasonable determination of the facts in light of evidence presented in the State court proceeding. §2254(d)(1), (2). The state court decision simply does not comport with the clearly established federal law, and does not even mention *Waller* in its decision.

(b)    Ineffective Assistance of Trial Counsel

Trial counsel failed to challenge the court room closures on her client's behalf, or insist that the trial court judge make findings as required by law. Trial counsel's performance was ineffective. *Strickland v. Washington*, 466 U.S. 668 (1984).

The state court judge did not address this claim in the order of dismissal. This Court reviews the claim *de novo*.

**II. Petitioner was denied his Sixth Amendment right to effective assistance of counsel when trial counsel failed to object to the introduction of a 12-gauge shotgun and seek suppression of this shotgun that was in no way connected to petitioner.[4]**

Trial counsel did not object to the State's introduction of a completely irrelevant shotgun. The State failed to provide any evidence at all that the gun it

---

[4]    The Attorney General's Office concedes this issue is exhausted.

admitted had any connection to either shooting, or even to petitioner! It was found behind a McDonald's restaurant in Dorchester County. Indeed, the Attorney General's Office concedes that the bullets found in connection with both D.T. and B.B.'s deaths (and which were from different weapons) *did not come from that gun.* DE 27, p.27. Its introduction therefore was irrelevant, and also extraordinarily prejudicial. The Attorney General's Office argues that its introduction was non-prejudicial because it was not related to the crime.

The gun was introduced into evidence at DE No. 27-3, p. 168 without objection from trial counsel. The State introduced the gun through Sergeant Walker, the lead investigator in this case. DE No. 27-3, p. 132. Walker testified to numerous aspects of this case. He interviewed a number of witnesses. He visited the scenes. He collected "pertinent evidence." DE No. 27-3, p. 136. He explained how petitioner became a suspect. He conducted the suspect evidence collection kit. He executed numerous warrants. He met with Eric Zack on three occasions. He sent "guns" and "bullet fragments" to be tested. DE No. 27-3, p. 155. He analyzed petitioner's driving record. Then, the solicitor asked this:

"[T]here was a shotgun that was recovered in regards to this case; is that correct?" DE No. 27-3, p. 157.

The solicitor then moved the *gun into evidence along with a map showing where the gun was found in relation to where B.B.'s body was found.* DE. No. 27-3, 168. The clear implication of the introduction of this evidence was to suggest to the jury that the gun had some connection with B.B.'s murder. Its introduction was

highly prejudicial and improper.  The prejudicial effect of this evidence was magnified by its introduction through the lead investigator in the case.  The jury would, rightfully, regard Sgt. Walker's testimony as highly probative given his intimate connection with the investigation.

The Solicitor then compounded the prejudicial effect of the introduction of this evidence when she argued during closing argument that the irrelevant shotgun may, in fact, be the murder weapon:

> She tells you a silver handgun he has.  What does he tell you? He stole a chrome 357 from Dante.
>
> You also have in the stipulations that Dante and Beverly were not killed with the same gun.  You want to bear that in mind.
>
> They tell you when they got back to Peter's, Amp and Peter start breaking down the 9-millimeter.  So that leaves us the Derringer which they take and give to Michael's cousin.  **That leaves this gun which is found by some McDonald's on Ashley Phosphate**, and that leaves the chrome 357 which Nicky sees him wiping down.

Volume 8, pp. 1591-92 (emphasis added).

The South Carolina state court addressed this issue and stated:

> This Court finds that Applicant was not prejudiced by counsel's failure to object to the admission of the shotgun.  In his written statement, Applicant admitted that Ms. B had taken a shotgun from Mr. Tobias's house.  Because there was no link between the gun and the two murders, the admission of the gun did not prejudice Applicant.

Docket 27-4, p. 424.

This decision is contrary to, or involves an unreasonable application of clearly established Federal law as determined by the Supreme Court of the United States, and is also an unreasonable determination of the facts in light of the evidence

presented in the State court proceeding. §2254(d)(1),(2). Its admission had a substantial and injurious effect on the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619.

The introduction of the shotgun was clearly error as it had no connection to these killings. As the Fifth Circuit held in *Lyons v. McCotter*, 770 F.2d 529 (1985), "To pass over the admission of prejudicial and **arguably inadmissible** evidence may be strategic; to pass over the admission of prejudicial and **clearly inadmissible** evidence . . . has no strategic value" (emphasis added). There is no question but that, had counsel objected to the admission of the shotgun, it would not have been entered into evidence. Instead, by not objecting, the jury was left with the clear impression that that gun belonged to petitioner, and that it had a connection with B.B.'s death. The introduction of this irrelevant non-evidence had a substantial and injurious impact on the jury because the Solicitor led the jury to believe it actually could have been the murder weapon and, more specifically, the weapon used to kill B.B. This is especially true given how little evidence there was that implicated petitioner in B.B.'s murder. Indeed, this irrelevant, non-evidence was the *only gun that was admitted into evidence at all*. There was no forensic evidence tying to petitioner to her murder; no eyewitnesses. As detailed in the statement of facts, there was very little probative evidence tending to tie petitioner to B.B.'s death which magnifies the prejudicial impact of trial counsel's failure to properly object to its introduction. The state court decision is contrary to, and involves an unreasonable application of *Strickland v. Washington*, 466 U.S. 668

(1984). It is also an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

**III. Petitioner was denied the effective assistance of counsel in violation of the Sixth Amendment and rights to a fair trial in violation of the 14th Amendment when counsel failed to object to the repeated references to petitioner's being in a maximum security prison at the time of trial. From the very outset of trial the jury was told that petitioner was serving time at the Lieber Correctional Institution, a local maximum security prison.[5]**

Trial counsel's performance fell well below professional norms when she allowed repeated references to be made at trial indicating that petitioner was housed in a maximum security prison facility as he awaited trial on these charges. In addressing this issue, the PCR court judge found:

> [T]rial counsel was not ineffective for failing to object to references to Applicant being housed at Lieber and for allowing prison guards to sit in close proximity to Applicant during trial. Counsel testified that Applicant was not in handcuffs or prison garb, and there were no references to Applicant being convicted of anything. In addition, counsel testified that she did not object to the potential juror's comment "I used to work for SCDC where he's at" because she did not want to draw attention to it. This Court finds that counsel properly noted her reasoning on the record.

DE No. 27-4, p. 424.

First of all, the PCR court's order does not accurately reflect what the record shows. The following is what happened at the PCR hearing:

> Q:    Okay. So on Line 27 that juror says in front of all the jurors, I used to work for SCDC where he's at. I've got two questions about that. Number one, how would he know that, if you know? And number two, why did you not object at that point and move for a mistrial for the fact the entire jury panel would have been tainted from the very beginning?

---

[5]    The Attorney General's Office concedes this issue is exhausted.

A:    I don't know how to answer that, other than to say that maybe we made a decision that when the juror responds where he's at, that it wasn't overly clearly who that person was referencing, but I'm not sure about that. And I could not answer how that person would know that that was where Mr. Mann was.

Q:    Okay. So I guess your other answer is, you're not sure why you didn't object? You said, we could have made this, we could have, but you can't recall?

A:    I don't recall.

DE No. 27-4, pp. 196-97. And see DE No. 27-4, p. 211 ("I do not remember it. I don't know how I could be more clear than that?")

Contrary to the judge's order, the testimony reflects that trial counsel did not give any reason why she did not object because she did not recall it. See *Gabaree v. Steele*, 792 F.3d 991, 999 (8th Cir. 2015) ("We cannot impute to counsel a trial strategy that the record reveals she did not follow"). See also *Alcala v. Woodford*, 334 F.3d 862, 871 (9th Cir. 2003); *Griffin v. Warden*, 970 F.2d 1355, 1358-59 (4th Cir. 1992).

But also, the PCR judge's order fails to consider why trial counsel repeatedly failed to object to the references to petitioner's placement in a maximum security prison while in pre-trial detention.

Failure to object to improper testimony because one does not want to "draw attention to it" is not a valid strategy because one can always make a motion for a mistrial outside the presence of the jury. See *Martin v. Grosshans*, 424 F.3d 588 (7th Cir. 2005) (trial counsel rendered ineffective assistance of counsel for, among

other things, not objecting to improper argument because he did not want to draw attention to it).

Evidence that petitioner was housed in a maximum security prison facility while in pre-trial detention was clearly highly inflammable, and prejudicial character evidence.

As the Fourth Circuit noted in *United States v. Queen*, 132 F.3d 991 (1997):

> The principal danger that Rule 404(b) targets is addressed by the language of the rule itself—that defendants not be convicted simply for possessing bad character. See *Michelson v. United States*, 335 U.S. 469, 475-76 (1948) (explaining that propensity evidence is excluded because it might "overpersuade" a jury and cause them to "prejudge one with a bad general record"); Wigmore on Evidence §58.2, at 1215 (Tillers rev. 1983) (noting the concern courts have felt over "the overstrong tendency to believe the accused guilty of the charge merely because he is a likely person to do such acts"). This danger is compounded by the idea that juries might face defendants whom the government has brought forth merely because it has "rounded up the usual suspects" who have a history of prior bad acts.

*Id.* at 997.

The jurors surely would have known about Lieber, as it is a well-known, violent prison located in that part of the state.[6] Trial counsel's failure to keep this information from the jury throughout petitioner's trial fell well below professional norms and petitioner's jury was substantially and injuriously affected by that failure. *Strickland*, *supra*; *Brecht*, *supra*. This decision is contrary to, or involves an unreasonable application of clearly established Federal law and determined by the Supreme Court of the United States, and is also an unreasonable determination

---

[6]    See Walking with Murderers:    An inside look at SC's Most Dangerous Prison. http://www.live5news.com/story/17037053/special-report-walking (*last visited* 10/26/15).

of the facts in light of the evidence presented in the State court proceeding. 2254(d)(1)(2).

During her cross-examination of Kristy Bunch, trial counsel elicited from her that petitioner was housed at Lieber:

> Q:    And then you told us that when he was out at Lieber, you all had a conversation and you all were arguing; is that correct?

DE No. 27-2, p. 211.

And again:

> Q:    And in doing so, you know that at Lieber, they record telephone conversations; is that correct?
>
> A:    Yes.

DE No. 27-2, p. 212.

And again:

> Q:    You got irritated with him because he was still seeing people like Maria Jacques while he was in prison; is that correct?  Or talking to her, talking to her?

DE No. 27-2, p. 225.

And again:

> Q:    So you were mad at him about lying about the women and he was irritated with you about sleeping with someone else while he was in jail and becoming a prostitute.  Or did you become a prostitute or just further it?  Had you already prostituted yourself before he went to prison?

DE No. 27-2, p. 226.

Then, trial counsel failed to object when the Solicitor called its investigator, John Burnett and elicited testimony that petitioner was housed pre-trial at Lieber:

> Q:     And as part of your investigation into this case, did you go to research telephone calls in the South Carolina Department of Corrections?
>
> A:     I did, at Lieber Correctional Institution.
>
> Q:     Tell the jury where Lieber is.
>
> A:     Lieber is west of Charleton in what is called Jedburg.

DE No. 27-3, p. 80.

Burnett then discussed how he traced calls "by inmate number." DE No. 27-3, p. 81.

Then,

> Q:     Do you know if there were any calls made on Anthony Mann's inmate number before June? Was he in Lieber before June?
>
> A:     He was. I believe he was incarcerated April 17th.

DE No. 27-3, p. 84.

And then again:

> Q:     And did you, in listening to these calls and in your experience with calls in the Department of Corrections, did you hear any three-way calls made?
>
> A:     Frequently.

DE No. 27-3, p. 86.

The Solicitor then elicited additional testimony that petitioner was housed at Lieber, through witness, Paula Stone.

> Q:     Where did you see him?
>
> A:     I saw him in two different institutions. I saw him in Lieber and the one most recent.

DE No. 27-3, p. 93.

Solicitor Wilson then had witness, Mervin Menier, without objection, testify that he met petitioner at the Charleston County Detention Center. DE No. 27-3, No. 99.

The state court decision is contrary to, or involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States and was based on an unreasonable determination of the facts in light of evidence presented in the state court proceeding. The opinion simply fails to take into account that it is well-established that the badges of incarceration may undermine the presumption of innocence. *Estelle v. Williams*, 425 U.S. 501 (1976). And see *United States v. Washington*, 462 F.3d 1124, 1136-37 (9th Cir. 2006) ("As with prison garb, when a jury is informed that the defendant remained incarcerated while waiting for trial, this can undermine the presumption of innocence."). Reasonable counsel would have known to object to the repeated references by state witnesses that petitioner was housed in a maximum security prison prior to trial, and indeed, trial counsel did not provide any reason for why she did not object. The PCR judge's order completely mischaracterizes the testimony from the hearing, and substitutes its own "strategic" reason when trial counsel did not, herself, offer one. Additionally, petitioner's jury was substantially and injurious effected by counsel's performance because they would have speculated that since petitioner was already incarcerated in a maximum security facility, that

he must be a dangerous person and therefore more likely to have committed the crimes here.

**V. Mann was denied the effective assistance of counsel in violation of the Sixth Amendment by and through trial counsel's failure to present the testimony of readily available experts in the line of pathology in reference to the time of death of B.B.[7]**

The South Carolina state court did not address this claim raised by petitioner in her order of dismissal. In response to the order of dismissal, petitioner filed a motion to amend the judgment to address this issue. DE No. 27-4, p. 433. The circuit court judge denied the motion without opinion. DE No. 27-4, p. 442. This Court reviews the claim *de novo*.

As PCR counsel argued to the judge, petitioner was with his girlfriend from Tuesday the week of the murders until the time of his arrest. The State's theory was that B.B. was murdered on Monday. The time of death was absolutely critical to the State's theory and petitioner's defense.

At trial, Dr. Susan Erin Presnell testified as to the time of death of B.B.[8] According to her testimony, her first opinion on the time of death, based on the condition of the body, was that B.B. had only been dead for a few days when her body was found. This would have put the time of death squarely within the time period for which petitioner had an alibi. Dr. Presnell admitted in her testimony that she received pressure from law enforcement to give an opinion on the time of death more compatible with law enforcement's theory of the murder.

---

[7]    The Attorney General's Office concedes this issue is exhausted.

[8]    Her testimony begins at DE No. 27-2, p. 420.

According to her trial testimony, Presnell used an alternative theory to determine a time of death for B.B. She used a measurement derived from the potassium levels in B.B.'s vitreous fluid. This vitreous fluid, located in the eyes, is measured with several different formulas. Presnell testified she was using one particular formula to offer an opinion regarding time of death that was more compatible with law enforcement's theory than other possible formulas.

Although trial counsel was able to make limited points with cross-examination, Presnell was still able to offer the opinion of time of death that was consistent with the State's theory that B.B. was killed on Monday.

At the PCR hearing, Dr. Janice Ross of Newberry Pathology Associates testified for petitioner. She is a forensic pathologist board certified in anatomic, clinical, and forensic pathology. She has been a pathologist for over thirty years and has testified numerous times regarding causes and manners of death. She has testified and performed autopsies for various state agencies. Dr. Ross was qualified to offer expert testimony in the field of forensic pathology.

Dr. Ross testified regarding the use of potassium levels in vitreous fluids to determine time of death. She testified she was aware of the process, but that it was no longer taught and had fallen out of favor as a way to determine time of death. By the time she was being trained, it was not being used as a way to determine time of death. DE No. 27-4, p. 307. The leading resources in forensic pathology do not recognize vitreous measurements for purposes of determining postmortem time interval. DE No. 27-4, p. 307. Dr. Ross testified, in her expert opinion, vitreous

fluid was not an acceptable way to determine time of death and should not be used to estimate time of death. She further testified this was the commonly accepted opinion in her field and most pathologists would have testified to this at the time of petitioner's trial. DE No. 27-4, p. 307.

This issue was particularly critical to the defense based on the State's theory. The State's own witness, Kristy Bunch, provided an alibi for petitioner almost the entire week in question. If the time of time of death were estimated to fall within this time period, petitioner would have had an absolute defense to B.B.'s murder.

There is no strategic reason for failing to secure an expert to impeach a state witness on a critical issue in the case, especially when the area of expertise is largely regarded by others in the field as unreliable and dated. As Dr. Ross testified, this manner of determining time of death has fallen out of favor with medical experts. The fact that defense counsel spoke to some experts about time of death issues does not mean that counsel rendered effective assistance of counsel when they failed to challenge a highly unreliable, disfavored method of determining death, and especially when time of death was the central issue in the case.[9]  See

---

[9] See *Dreher v. Pinchak*, 61 Fed. Appx. 800 (3rd Cir. 2003), regarding vitreous measurement to determine time of death: "The District Court was clearly concerned about the admission of Dr. Tucker's testimony, writing that "[e]ven under the liberal standards of the Federal Rules of Evidence, Dr. Tucker's testimony should not have made it past the 'gatekeeping role' of the trial judge." *Dreher v. Pinchak*, Slip Op. at 25 (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). The District Court was likewise alarmed that the trial court "permitted Dr. Tucker to present his findings, despite the fact that his method of applying the vitreous potassium test fails to satisfy" the traditional indicia of reliability. *Id.* Finally, the District Court opined that "[w]ere it a question of first impression for this Court to decide, the admission of this testimony might well be considered a violation of petitioner's rights of due process." *Id.* Then, after recognizing that "it is well established that due process may be violated by the admission of certain categories of unreliable and prejudicial evidence," the District Court concluded that, "standing alone, the admission of Dr. Tucker's testimony did not violate petitioner's right to due process." *Dreher v. Pinchak*, Slip Op. at 26, 27.

*Thomas v. Clements*, 789 F.3d 760 (7th Cir. 2015) (Defense counsel's failure to consult with pathologist or other medical expert as to whether murder victim's strangulation death could have been result of accident amounted to deficient performance, and when defense counsel's failure to reach out to expert was not conscious decision, but that he just did not think to do so); *Foster v. Wolfenbarger*, 687 F.3d 702 (6th Cir. 2012) (Defense counsel's failure not to further investigate and present alibi defense was deficient, although counsel interviewed alibi witness over the phone for approximately 15 to 20 minutes and found witness's testimony to be vague, counsel failed to perform any additional investigation); *Woolley v. Rednour*, 702 F.3d 411 (7th Cir. 2012) (Defendant's trial counsel's failure to secure expert opinion to rebut testimony of State's crime scene investigator rendered trial counsel's performance objectively unreasonable; it was undisputed there was no strategic rationale underlying trial counsel's error, and there were significant holes in the crime scene investigator's conclusions that required expert illustration by defense in order for the jury to weigh the evidence fairly).

Trial counsel's performance was objectively unreasonable, and fell well below professional norms. *Strickland*, *supra*. Had counsel contacted any pathologist and inquired as to the use of vitreous fluids for determining time of death, she would have realized that it was not a reliable method. And at least one district court found it "alarming" that this method was admitted into evidence in another case. Trial counsel's failure to do so, when time of death was the key issue in the death of B.B., rendered her performance ineffective.

**VII.    Anthony Mann was denied effective assistance of counsel in violation of the Sixth Amendment as a result of trial counsel's failure to challenge and seek suppression of Mann's post-arrest statement illegally coerced from him upon arrest.[10]**

Trial counsel rendered ineffective assistance of counsel when she did not place Mann on the stand to testify to the conditions surrounding the giving of his statement to police.  Mann consistently told counsel that his statement was the product of fear, intimidation, and sexual assault.  Reasonably competent counsel would have realized that those factors can render a confession involuntary under federal Constitutional law.  See *Arizona v. Fulminante*, 499 U.S. 279, 285-86 (1991) (holding that a confession was unconstitutionally coerced based upon the totality of the circumstances and placing special emphasis on the fact that the interrogating agent promised to protect the suspect from physical violence from other inmates in exchange for his confession); *Payne v. Arkansas*, 356 U.S. 560, 564-67 (1958) (holding that a confession was unconstitutionally coerced because the interrogating police officer had promised that if the accused confessed, the officer would protect the accused from an angry mob outside the jailhouse door).

Although counsel testified at the PCR hearing that she had no recollection of her discussions with Mann about his statement, Docket No. 27-4, p.245-46 a letter introduced at the PCR hearing, dated January 4, 2003 specifically references the treatment he received.  Trial counsel did testify that she remembered threats made to Mann's then girlfriend, Kristy Bunch.  Docket No. 27-4, p. 247.  In the end, trial counsel cannot remember why Mann did not testify.  Docket No. 27-4, pp. 247-48.

---

[10]    The AG concedes this issue is exhausted.

The South Carolina state court addressed this claim and held:

> This Court finds that trial counsel properly challenged the voluntariness of Applicant's statements. Mr. Butler represented Applicant during his *Jackson v. Denno* hearing, after which the trial court found that the statements were made freely and voluntarily.

Docket No. 27-4, p. 424.

This decision is contrary to, or involves an unreasonable application of clearly established Federal law as determined by the Supreme Court of the United States, and is also an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. §2254(d)(1)(2). Its admission had a substantial and injurious effect on the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619.

There cannot be any "strategic" reason for failing to call your client to the stand to dispute the voluntariness of an inculpatory statement when that hearing would have been conducted outside the presence of the jury, and would have provided a legal basis upon which to suppress the statement. Indeed, counsel cannot articulate any reason why neither she nor co-counsel thought to call him to the stand. It is therefore an unreasonable application of *Strickland v. Washington*, 466 U.S. 668 (1984) to assume that counsel therefore rendered effective assistance of counsel based on the record which only shows that a motion to suppress was made. Indeed, counsel objected to the introduction of the statement at trial so it is clear that counsel recognized its damaging character. There cannot be any strategic reason for failing to put up the basis for the objection at the appropriate time, and the introduction of petitioner's statement had a substantial and injurious effect on

the jury since it was offered by the State in its attempt to show that petitioner knew B.B.'s hair would be on him (it was not).  The Solicitor took advantage of trial counsel's deficient performance when she argued at closing argument:

> Mann went and helped Brownie and was going to rob him if he didn't act right.  What does that mean, didn't act right?  His own statement, I didn't really feel like leaving Monck's Corner to go get her . . .
>
> Again, Anthony Mann knew about Brownie and he knew about the safe.  Again, **his own statement, his own statement** gives you the murder of D.T.

DE No. 27-4, p. 4 (emphasis added).

> Remember again, he's admitted under the law, under the law, to the murder of D.T. **in his statement**.  I submit to you that all of his statement isn't true, there are some key facts.  There is a kernel of truth.  And I believe there is some saying about there is a kernel of truth in every lie.  Look at that and then start thinking about B.B.

DE No. 27-4, p. 16 (emphasis added).

> Amp **says in his statement**, I dropped her off at [redacted]. Well, well what a coincidence that she gets taken to [redacted], which I believe is somewhere on Rivers Avenue . . .

DE No. 27-4, p. 21 (emphasis added).

Trial counsel rendered ineffective assistance of counsel, and the state court decision falls within 2254(d)(1), (2).   As evidenced by the Solicitors repeated use of the statement during her closing argument, trial counsel's failure to put forward evidence to suppress the statement had a substantial and injurious effect on the jury and constituted clear ineffective assistance of counsel.  *Strickland*, *supra*; *Brecht*, *supra*.

**IX. Mann was denied his Sixth Amendment right to effective assistance of counsel as a result of trial counsel's failure to object to drug related and**

**other inadmissible prior bad acts testimony admitted through state's witness, Kristy Bunch.[11]**

During her testimony, the Solicitor elicited highly inflammatory and irrelevant character evidence from Kristy Bunch, petitioner's former girlfriend:

> Q:    What did you all talk about then?
>
> A:    They had gone and done something that they were proud of. They were, like, busted someone's house up or something; one of Dan's girlfriend's boyfriends that he's made at.  I didn't ask what they actually did.  I didn't want to know.  But they were all, you know, ramped up about whatever they had done.

DE No. 27-2, p. 129.

Trial counsel did not object.

Later, Bunch testified, in response to questioning from the solicitor:

Q: Did he want to talk to other people about other things?

A: Yes, he did.  He wanted to talk to Dan about getting drugs together to have them---.

DE No. 27-2, p. 138.

This time trial counsel objected.  The trial court judge denied the motion for a mistrial.

Addressing this claim, the South Carolina state court held:

> This Court finds that counsel properly moved to exclude prior bad acts under Lyle and Rule 404(b), SCRE, and properly objected when prior bad acts were referenced.  Counsel objected during Kristy Bunch's testimony when Ms. Bunch mentioned Applicant's warrants and probation officer.  Counsel later made a motion for a mistrial when Ms. Bunch testified that Applicant wanted to call a friend to arrange to get drugs together.

DE No. 27-4, p. 425.

---

[11]    The AG's office concedes this issue is exhausted.

The PCR judge's order completely ignores the fact that the trial court judge found that counsel's objection was not timely:

> THE COURT:     All right.  I've thought about your arguments that have been advanced to the Court and considered the nature of the objection, the timing of the objection, et cetera, and I've decided that I'm not going to grant a mistrial.  I think that any prejudice can be cured by a curative instruction.
>
> I'm not—I'm prepared to hear you out on a curative instruction insofar as the reference to drugs as well as the house, even though I do think that the timing of the issue about the houses and talking to officials or judges or whatever came up later, and generally you shouldn't be able to advance an argument of prejudice and ask for a mistrial at that point, but I'll be happy to hear you on a curative instruction that might include both, if you want a curative instruction.

DE No. 27-2, p. 151.

The state court's adjudication of petitioner's claim resulted in a decision that contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, and was also based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.    §2254(d)(1),(2).   Trial counsel rendered ineffective assistance of counsel, as evidenced by the trial court judge's statement at the time of trial that her objection was not timely made. *Strickland*, *supra.*  The state court decision simply misstates the record on this point.   Petitioner's jury was substantially and injuriously affected by his counsel's substandard performance because, in this circumstantial case, the jury heard improper character evidence

which would have suggested petitioner's propensity to act in conformity with that character.[12]

**X. Anthony Mann was denied effective assistance of counsel in violation of the Sixth Amendment when trial counsel failed to object to the state's improperly arguing the guilty pleas of Mann's co-defendants, Michael Crumb and Eric Zack, as evidence to infer guilt upon Mann, and commenting upon Mann's exercising his constitutional rights to a jury trial, and to put the state to its burden of proving him guilty beyond a reasonable doubt.[13]**

During her closing argument, the Solicitor argued:

Under the law, ladies and gentlemen, as I said, the hand of one is the hand of all. If a crime committed by two or more persons, B.B. and Anthony Mann, who are acting together in the commission of that offense, the act of one is the act of all. This is true if there are two people ore more than two people involved in the act.

Eric Zack, Michael Crumb pleading guilty. The hand of one is the hand of all.

DE No. 27-3, p. 498.

The Solicitor's remarks were an improper comment on petitioner's right to remain silent. The Fifth Amendment prohibits "comment by the prosecution on the accused's silence . . . that such silence is evidence of guilt." *Griffin v. California,* 380

---

[12]     And, as also quoted in Argument III: *United States v. Queen*, 132 F.3d 991 (1997):

The principal danger that Rule 404(b) targets is addressed by the language of the rule itself—that defendants not be convicted simply for possessing bad character. See *Michelson v. United States*, 335 U.S. 469, 475-76 (1948) (explaining that propensity evidence is excluded because it might "overpersuade" a jury and cause them to "prejudge one with a bad general record"); Wigmore on Evidence §58.2, at 1215 (Tillers rev. 1983) (noting the concern courts have felt over "the overstrong tendency to believe the accused guilty of the charge merely because he is a likely person to do such acts"). This danger is compounded by the idea that juries might face defendants whom the government has brought forth merely because it has "rounded up the usual suspects" who have a history of prior bad acts.

[13]     The AG's office concedes this issue is exhausted.

36

U.S. 609, 615 (1965). This includes suggestions that a defendant's silence is indicative of guilt. *Portuondo v. Agard,* 529 U.S. 61, 69 (2000). In *Doyle v. Ohio,* 426 U.S. 610, 619 (1976), the Supreme Court held that "the use for impeachment purposes of [a defendant's] silence, at the time of arrest and after receiving *Miranda* warnings, violate[s] the Due Process Clause of the Fourteenth Amendment." As the Court has recognized in numerous post-*Doyle* opinions, the *Doyle* rule "rests on 'the fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him and then using his silence to impeach an explanation subsequently offered at trial.' " *Wainwright v. Greenfield,* 474 U.S. 284, 291 (1986) (quoting *South Dakota v. Neville,* 459 U.S. 553, 565 (1983)). That is precisely what the Solicitor did in this case—she used the fact of petitioner's co-defendant's pleading guilty to argue petitioner was guilty-- an improper remark on his right to remain silent and his right to put the State to its burden of proving him guilty beyond a reasonable doubt. Because trial counsel did not object to the Solicitor's remark, there was no curative instruction given to the jury.

The state court found that counsel was "not ineffective for failing to object to the Solicitor's comment that the two co-defendants had pled guilty and taken responsibility for their actions and that the hand of one is the hand of all. Counsel testified that she did not think the comment was a violation of the Applicant's right to a jury trial. Rather, counsel testified that she believed the Solicitor was pointing out that Mr. Zack and Mr. Crumb have taken responsibility for their actions." DE No. 27-4, p. 428.

The state court's decision was contrary to, or involved an unreasonable application of clearly established Federal law and was an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.   Trial counsel clearly should have objected to the Solicitor's improper remark during her closing argument.   Her failure to do so violated *Strickland v. Washington*, 466 U.S. 668 (1984), and petitioner's jury was substantially and injuriously affected by her failure.  *Brecht*, *supra*.

**XII.     Petitioner was denied his right to the effective assistance of counsel in violation of the Sixth Amendment as a result of trial counsel's failure to object to the Solicitor's improperly commenting upon, vouching for, and placing the imprimatur and prestige of the government behind the state's law enforcement witnesses, as well as the state's case.[14]**

During her closing argument, Solicitor Wilson made a number of improper statements that so infected the trial with unfairness that petitioner's convictions cannot stand.   Trial counsel rendered ineffective assistance of counsel by not objecting at the time the statements were made.[15]

The Solicitor argued that her witnesses, with all of their years and years of experience, would not risk their careers and reputations by framing an innocent man:

> And think about whether or not Detective Walker in law enforcement for years; Sergeant Presnell in law enforcement for years;

---

[14]     The AG's office argues that this issue is not exhausted.   Solicitor Wilson's closing argument begins at DE No. 27-3, p. 495.

[15]     The Solicitor also intimated, without any good faith basis, that petitioner raped B.B.: Anthony Mann tells Mervin Menier when it happened. I don't know how they got back in those woods.  I don't know that they took Danielle Batista's car back through those woods.  I don't know if they walked her out there.  **I don't know if they raped her**.  But what I do know if he told Mervin Menier it happened after the robbery. Volume 8, p. 1589.

Deputy Coroner Rae Wooten, who has been doing this for years; Erin Presnell, the forensic pathologist, doing this for years. They are going to stake their careers and their reputations in order to frame some innocent man?

DE No. 27-3, and Volume 8, p. 1571.

The Solicitor then argued that her witnesses would not risk their careers lying for a runaway stripper:

This was not Joe Riley's daughter. This was a runaway. How easy of them would it have been to say, Well, yeah, we put her picture in the paper, but she also was a known prostitute, she was a known stripper, she was a runaway. Family, what family? Where was her family for all this time that she was running around? Do you think that that would have really gained momentum? So must momentum that all of these professionals are going to stake their careers on changing the evidence?

Volume 8, p. 1571.

The state court, in addressing this claim, stated:

"[T]his Court finds that counsel was not ineffective for failing to object to the State's purported improper bolstering, vouching for, and placing the prestige of the government behind the State's case. Counsel testified she did not believe it was improper bolstering. Moreover, counsel fully attacked law enforcement in her closing argument."

DE No. 27-4, p. 428.

Solicitors are not allowed to vouch for, or bolster, the testimony of witnesses in arguments to the jury. *United States v. Sanchez*, 118 F.3d 192 (1997); *United States v. Lewis*, 10 F.3d 1086, 1089 (4th Cir. 1993). Vouching occurs when a prosecutor indicates a personal belief in the credibility or honesty of a witness; bolstering is an implication by the government that the testimony of a witness is corroborated by evidence known to the government but not known to jury. *Sanchez*

at 198.  While vouching and bolstering are always inappropriate, "[i]mproper remarks during closing argument do not always mandate retrial.  The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *United States v. Mitchell*, 1 F.3d 235, 240 (4th Cir. 1993) (internal quotation marks and citations omitted).

There is no question but that the Solicitor improperly bolstered the testimonies of all of her key law enforcement witnesses by indicating that they would not risk their careers or reputations to either convict an innocent man, or to help out a non-politically connected runaway prostitute. The Solicitor bolstered the testimonies of the lead investigator, Sgt. Walker, Sgt. Presnell, Coroner Rae Wooten, and her forensic pathologist, Dr. Erin Presnell.  These witnesses were the absolute heart and soul of her case against petitioner, and she made two related bolstering arguments on their behalf.  First, that they would not risk their careers or reputations to imprison an innocent person, but also that they would not have cared enough about the victim to do so.  Her argument was as offensive as it was improper, and petitioner was prejudiced by trial counsel's failure to object.  The fact that counsel did not recognize these statements as constituting improper bolstering does not mean the remarks were appropriate.  Indeed, it confirms that trial counsel's performance fell well below professional norms.  See *United States v. Miller*, 621 F.3d 723 (8th Cir. 2010) ("risk career" remarks substantially prejudiced defendant's right to fair trial); *United States v. Garcia*, 522 F.3d 597 (5th Cir. 2008)

(statements similar to ones in issue here constituted impermissible bolstering and required reversal); *United States v. Boyd*, 54 F.3d 868 (D.C. Cir. 1995) ("risk career" clearly improper); *United States v. Johnson-Dix*, 54 F.3d 1295 (7th Cir. 1995) ("risk careers" improper); *United States v. Badger*, 983 F.2d 1443, 1451 (7th Cir. 1993) (improper to ask jury whether agent would risk job, reputation, and pension to lie about defendant where no evidence was offered on these topics).

The state court decision is contrary to, or involves an unreasonable application of clearly established Federal law and determined by the Supreme Court of the United States, and is also an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.  2254(d)(1)(2). Counsel rendered ineffective assistance of counsel.  *Strickland v. Washington*, 466 U.S. 668 (1984).  Trial counsel's failure to object to the Solicitor's improper bolstering of all of her key, law enforcement witnesses, had a substantial and injurious effect on the jury's verdict.  *Brecht v. Abrahamson*, 507 U.S. 619.

The Attorney General's Office argues that this issue is not exhausted.  See DE No. 27, p. 45 ("Respondent notes that a procedural bar attaches to Ground Twelve ["prestige of government" argument] and Thirteen ["Krystal Lackey" argument], as they were abandoned on appeal").

Ordinarily a habeas petitioner is procedurally barred from obtaining federal habeas review of a claim if he failed to raise and exhaust the claim in state court. See *Coleman v. Thompson*, 501 U.S. 722 (1991); *Wainwright v. Sykes*, 433 U.S. 72 (1977).  Per the procedural default doctrine articulated in these cases, habeas

review of the claim is only allowed if the petitioner can show (1) cause for the default and prejudice resulting therefrom, or (2) that the failure to consider the claim will result in a fundamental miscarriage of justice.  See *Coleman*, 501 U.S. at 750.

In some circumstances, a petitioner may establish cause if he was represented by counsel whose performance was constitutionally ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984).  See *Coleman*, 501 U.S. at 752; *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  In *Coleman*, however, the Supreme Court held that because "[t]here is no constitutional right to an attorney in state post-conviction relief proceedings," a federal habeas "petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings" to establish cause." *Fowlers v. Joyner*, 753 F.3d 446, 460 (4th Cir. 2014) (quoting Coleman, 501 U..S. at 752).

In *Martinez v. Ryan*, ___ U.S.___, 132 S.Ct. 1309 (2012), the United States Supreme Court announced a "narrow exception" to the *Coleman* rule.  The Court held:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was [constitutionally] ineffective.

*Id*. at 1320.

*Martinez* then, allows a habeas petitioner who seeks to raise an otherwise procedurally defaulted claim of ineffective-assistance-of-trial counsel before the

federal court may do so only if: (1) the ineffective assistance of trial counsel claim is a substantial one; (2) the "cause" for default "consist[s] of there being no counsel or only ineffective counsel during the state collateral review proceeding"; (3) the state collateral review proceeding was the initial review proceeding in respect to the ineffective assistance of trial counsel claim"; and (4) state law "requires that an ineffective assistance of trial counsel claim be raised in an initial review collateral proceeding." *Trevino v. Thaler*, _U.S._, 133 S.Ct. 1911, 1918 (2013).

PCR counsel's ineffectiveness provides cause to excuse the procedural default and adjudicate Mann's claim on the merits. PCR counsel simply failed to raise the issue in the petition for writ of certiorari even though the allegation was raised in petitioner's application for post-conviction relief. The issue is a meritorious one, and failure to raise the issue to the South Carolina Supreme Court constituted ineffective assistance of PCR counsel.

**XVIII.    Petitioner was denied the effective assistance of counsel in violation of the Sixth Amendment as a result of the overwhelming cumulative prejudicial effect of each of the enumerated errors committed by trial counsel that also effectively denied Petitioner his fundamental rights of due process and a fair and public trial.[16]**

Petitioner argues that the preceding errors individually provide bases upon which to grant habeas relief but, alternatively, he is entitled to relief based on the cumulative effect of these failures. There is a circuit split on this issue and, to date, the Fourth Circuit has insisted that ineffective assistance of counsel claims must be viewed individually rather than collectively. See *Fisher v. Angelone*, 163 F.3d 835,

---

[16]    The AG concedes this issue is exhausted.

852 (4th Cir. 1998) (announcing ineffective assistance of counsel claims "must be reviewed individually, rather than collectively).[17] This Court, however, should follow the reasoning of the Second, Seventh, and Ninth Circuits that allow an inmate like petitioner to prove he suffered ineffective assistance of counsel based on the cumulative effect of trial counsel errors. See *Ewing v. Williams*, 596 F.2d 391, 396 (9th Cir. 1997) (finding that "multiple deficiencies have the cumulative effect of denying a fair trial to the [habeas corpus] petitioner"); A "claim of ineffective assistance of counsel can turn on the cumulative effect of all of counsel's actions." *Rodriguez v. Hoke*, 928 F.2d 534, 538 (2nd Cir. 1991).   See also *Williams v. Washington*, 59 F.3d 673, 682 (7th Cir. 1995) (defendant may demonstrate that the cumulative effect of counsel's individual acts or omissions was prejudicial); *Harris ex rel. Ramseyer*, 64 F.3d at 1438 (recognizing that "prejudice may result from the cumulative impact of multiple deficiencies") (internal quotation marks omitted). Even before *Strickland v. Washington*, the Ninth Circuit recognized the cumulative error doctrine.   See *Ewing*, *supra*, 596 F.2d at 396 ("Where no single error or omission of counsel, standing alone, significantly impairs the defense, the district court may nonetheless find unfairness and thus, prejudice emanating from the totality of counsel's errors and omissions.").

If the Constitutional guarantee is the right to a fair trial, it does not make sense that a court is simply not allowed to consider the cumulative effect of multiple errors that occurred in the trial.  As the Seventh Circuit noted in *Williams*, *supra* at

---

[17]    The Eighth, Tenth, and Sixth Circuits follow the Fourth Circuit approach. See *Wainwright b. Lockhart*, 80 F.3d 1226 (8th Cir. 1996); *United States v. Rivera*, 900 F.2d 1462 (10th Cir. 1990); *Sutton v. Bell*, 645 F.3d 752 (6th Cir. 2011).

684, "Assessments of prejudice are necessarily fact-intensive determinations peculiar to the circumstances of each case."  Any reviewing court should have the ability to assess, collectively, the impact of attorney errors on the outcome of the case.  The Fourth Circuit's approach, to date, unnecessarily cabins the judicial role by insisting that it is not allowed to take a larger view of the case in light of multiple errors.

But additionally, the language of *Strickland* itself militates in favor of acknowledging a cumulative effect doctrine in that it "requires showing that counsel's *errors* were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  *Id*. at 687 (emphasis added).  The language of *Strickland* appears to invite an assessment of whatever errors may be present to assess their outcome on the reliability of the trial.

The Fourth Circuit's current refusal to acknowledge the viability of the cumulative affect doctrine means that defendants in this Circuit are being afforded less protection than those in the Second, Seventh, and Ninth Circuits.  This Court should avail itself of the opportunity to urge a new approach.

**XX.    Petitioner was denied his Sixth Amendment right to the effective assistance of appellate counsel as a result of appellate counsel's failure to motion the court to unseal sealed portions of petitioner's trial transcript, and properly advise Petitioner of his rights and correct procedures.[18]**

Before the South Carolina Supreme Court, counsel argued the following:

---

[18]    The AG concedes this issue is exhausted.

The PCR court erred by not finding appellate counsel ineffective for failing to order certain transcripts, maintain contact with petitioner and properly advising him of his rights and correct procedures.

The South Carolina Supreme Court denied certiorari.

In his motion to amend the judgement, petitioner raised the issue the issue of appellate counsel's failure to request the transcripts of the sealed portions of the trial. As a result, those transcripts have now been destroyed, completely denying petitioner the opportunity to have an appellate court review them.[19] Petitioner alleged this as a denial of his right to the effective assistance of counsel. The state court judge, in her summary denial, did not address the claim. DE No. 27-4, pp. 437, 442. This Court's review is *de novo*.

Appellate counsel rendered ineffective assistance of counsel when he did not secure the existence of transcripts-- their existence readily apparent from the record-- and when there could not be any strategic reason for failing to do so.[20] As an imprisoned, indigent inmate, petitioner was unable to secure the transcripts

---

[19] See SCACR, Rule 607 (i): Retention of Tapes. Except as provided below, a court reporter shall retain the primary and backup tapes of a proceeding for a period of at least five (5) years after the date of the proceeding, and the court reporter may reuse or destroy the tapes after the expiration of that period. If the proceeding was a hearing or trial which lasted for more than one day, the time shall be computed from the last day of the hearing or trial. In any proceeding which has been transcribed, the court reporter shall retain the primary and backup tapes which have been transcribed for a period of at least thirty (30) days after the original transcript is sent to the requesting party, to allow any party to challenge the accuracy of the transcription. If no challenge is received by the court reporter within the thirty (30) day period, the tapes may be reused or destroyed.

[20] In *Grayton v. Warden Lieber Correctional Institution*, 2012 WL 3096288, Judge Cameron McGowan Currie held that this same appellate attorney abandoned his client when he did not inform his client that the client's cert petition had been denied by the Court of Appeals. Appellate counsel failed to send his client either a copy of the order denying cert, or the remittitur. Judge Currie cited both *Holland v. Florida*, 560 U.S. ___, 130 S.Ct. 2549 (2010) and *Maples v. Thomas*, __U.S.__, 132 S.Ct. 912 (2012) and held this attorney "fail[ed] to satisfy professional standards of care" (quoting *Holland*, 130 S.Ct. at 2562). The district court allowed equitable tolling for this petitioner's claims.

himself.  He necessarily had to rely on his lawyer to handle the task of ordering the transcripts.

Appellate counsel's subpar performance is even more egregious in light of the specific claims petitioner made during trial-- that witnesses he expected would testify on his behalf instead were intimidated into not testifying for him.  There were numerous witnesses who testified during a "witness intimidation" hearing that appellate counsel never ordered.

Trial counsel could not recall what was contained in that hearing:

A:    There were some allegations made by Mr. Mann that law enforcement had been putting undue pressure on some of the witnesses that he had hoped would testify for him.  And Judge Pieper explored that by calling both the witnesses and the law enforcement officers.  And I know we made a record of all of that.

Q:    And do you recall what was the gist of those hearings, what was found, what was discussed?

A:    No.  I'm sure it would have been in those transcripts.[21]

DE No. 27-4, pp. 232-233.

There is no question but that petitioner had the right to those transcripts for purposes of perfecting his appeal.  See *Griffin v. Illinois*, 351 U.S. 12 (1956); *Mayer v. City of Chicago*, 404 U.S. 189 (1971).  Appellate counsel could not have had any strategic reason for failing to simply order the transcripts.  The existence of these additional hearings was patent from reading the trial transcripts, and appellate counsel filed the brief (raising only one issue) within the time frame that the transcripts were still available.  Appellate counsel's performance fell well below

---

[21]    And see http://www.postandcourier.com/article/20090930/PC1602/309309926 for another instance of witness tampering in a Ninth Circuit Solicitor's Office prosecution (*last visited* 10/19/15).

professional norms, and petitioner has been prejudiced due to his inability to have an appellate court review matters relating to the Berkeley County's investigation into Peter Davies, which counsel argued was critical to petitioner's defense, or petitioner's allegations of witness tampering on the part of the Solicitor's Office. In a case that relied so heavily on the testimonies of flawed characters, and with no physical evidence connecting petitioner to the death of BB, petitioner was prejudiced by appellate counsel's inaction. *Strickland*, *supra*; *Lucy v. Evitts*, 469 U.S. 396 (1985).

**D.    Conclusion**

For the reasons presented above, petitioner respectfully asks this Court to grant the writ, and release him from custody.

Respectfully submitted,

/s/ Elizabeth A. Franklin-Best
Elizabeth A. Franklin-Best
Fed Id 9969
Blume Norris & Franklin-Best, LLC
900 Elmwood Avenue, Ste. 200
Columbia, South Carolina 29201
betsy@blumelaw.com
(803) 765-1044

Counsel for Anthony Mann

11/2/15
Columbia, South Carolina.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

Anthony Mann (242498),           )        C/A No. 0:15-cv-163-RMG-PJG
                  Petitioner,    )
                                 )
v.                               )        Certificate of Service
                                 )
Warden of Lee Correctional,      )
Cecelia Reynolds,                )
                  Respondent.    )
_____)


       I certify that on this date I served the Attorney General's Office by filing via
ECF.

                                 Respectfully submitted,

                                 /s/ Elizabeth A. Franklin-Best
                                 Elizabeth A. Franklin-Best
                                 Fed Id 9969
                                 Blume Norris & Franklin-Best, LLC
                                 900 Elmwood Avenue, Ste. 200
                                 Columbia, South Carolina 29201
                                 betsy@blumelaw.com
                                 (803) 765-1044

                                 Counsel for Anthony Mann

11/2/15
Columbia, South Carolina.